WISCONSIN TRACTION, LIGHT, HEAT & POWER COMPANY, Petitioner and Respondent, vs. GREEN BAY & MISSISSIPPI CANAL COMPANY and others, Appellants.

*September 26—October 20, 1925.*

*Public utilities: What constitute: Who determines question: Corporation furnishing water power: Dedication of power dams to public use: Navigable waters: State as trustee: Paramount control by federal government: Real estate of utility as personal property.*

1. That which in other ownership would be real estate is, when owned and used by a public utility, personal property.    p. 63.

2. The question whether a corporation is a public utility as de-
fined by sec. 196.01, Stats., must be determined by the judi-
ciary, and its solution is not dependent on the attitude which
the corporation may itself assume by either submitting to or
refusing to submit to the jurisdiction or control of the rail-
road commission, or whether the commission has assumed
control and jurisdiction or failed or refused so to do.   p. 63.
3. There are no precise formalities which must be undergone be-
fore a corporation becomes a public utility and default in
which is an insuperable barrier to its becoming such.   p. 64.
4. The state, under the ordinance of 1787 and the state constitu-
tion, is a trustee of the navigable waters within its confines,
not merely for the people of this state but of the United
States, and the federal authority is paramount.   p. 65.
5. When a corporation enters the field of furnishing and selling
water power created by dams in the navigable waters of the
state, it in effect dedicates such water power to public use,
especially in view of ch. 380 of the Laws of 1915, placing the
subject matter of the Milldam Act under the control of the
railroad commission.   p. 66.
6. A canal company whose valuable asset was the right to own
and use the surplus water of a river, subject to the primary
right of the United States government to regulate and control
the amount thereof as needed for navigation purposes, rather
than its real estate adjacent to the river, is a public utility
within the meaning of sec. 196.01, Stats., especially where it
undertook to furnish directly or indirectly hydro-electric
power for lighting and heating purposes to the public, with
a provision for an increase in its rent from any increase in
rates charged the public.   Its property, therefore, was pro-
tected from condemnation proceedings by another public
utility under secs. 32.01 to 32.20.   pp. 66, 67.

APPEAL from orders of the circuit court for Outagamie
county: EDGAR V. WERNER, Circuit Judge.   *Reversed.*

The petitioner, respondent here, *Wisconsin Traction,
Light, Heat & Power Company,* hereinafter called the *Trac-
tion Company,* instituted condemnation proceedings under
the eminent-domain statute, seeking condemnation of cer-
tain lands and water powers appurtenant thereto and certain
easements, estates, or interests therein for its purposes in
the operation by it as a public utility of a street and inter-
urban railway and furnishing electric light and power to the

public. The petition in said matter was verified July 14, 1924, and notice of hearing on the same was served on the appellant herein August 9, 1924, and hearing had in September, 1924.

The real estate involved was a narrow strip about 1,600 feet long in the city of Appleton bordering on the Fox river, the United States dam in said river, and the United States canal.

The dam here in question is one of several on the Fox river which are kept up and maintained by the United States government for the declared purpose of aiding the navigation of said river, in which dams the *Green Bay & Mississippi Canal Company,* hereafter called the *Canal Company,* has an interest, such interests being based upon the reservations contained in a certain deed of September 18, 1872, by the *Canal Company* to the United States government. A history of the transactions relating to the situation of the *Canal Company* and its predecessor in title with the United States government, the state of Wisconsin, and others may be found in *Kaukauna W. P. Co. v. Green Bay & M. C. Co.* 142 U. S. 254, 12 Sup. Ct. 173; *Green Bay & M. C. Co. v. Patten P. Co.* 172 U. S. 58, 19 Sup. Ct. 97; *Green Bay & M. C. Co. v. Patten P. Co.* 173 U. S. 179, 19 Sup. Ct. 316; *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 70 Wis. 635, 35 N. W. 529, 36 N. W. 828; *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 90 Wis. 370, 61 N. W. 1121, 63 N. W. 1019; *Patten P. Co. v. Green Bay & M. C. Co.* 104 Wis. 24, 83 N. W. 1119.

The conveyance with its reservations by the *Canal Company* to the United States government in 1872, so far as here material, is as follows:

"In consideration of the sum of one hundred and forty-five thousand dollars paid by the United States of America, the said party of the second part, the receipt whereof is hereby acknowledged, the *Green Bay & Mississippi Canal Company,* the said party of the first part, hath granted,

bargained, and sold and by these presents doth grant, bargain, and sell unto the said United States of America, the party of the second part, the following described property rights, franchises, etc., situate in the state of Wisconsin, and described as follows, to wit: All and singular its property and rights of property in and to the line of water communication between the Wisconsin river aforesaid and the mouth of the Fox river, including its locks, dams, canals, and franchises, saving and excepting therefrom and reserving to the said party of the first part the following described property rights and portion of franchises, which in the opinion of the secretary of war and of Congress are not needed for public use, to wit: First, all of the personal property of said company, and particularly all of such property described in the list or schedule attached to the report of said arbitrators and now on file in the office of the secretary of war, to which reference is here made, whether or not such property be appurtenant to said line of water communication. Second, also all that part of the franchises of said company, viz.: the water powers created by the dams, and by the use of the surplus waters not required for the purpose of navigation, with the rights of protection and preservation appurtenant thereto, and the lots, pieces, or parcels of land necessary to the enjoyment of the same and those acquired with reference to the same, all subject to the right to use the water for all purposes of navigation as the same is reserved in leases heretofore made by said company."

In 1901 a lease was executed by the *Canal Company* to the *Traction Company* of a certain portion of the real estate in question, with a grant of the right to use for hydraulic power one half of the flow of Fox river not required for navigation at the upper or Grand Chute dam in Appleton (the United States government dam hereinbefore mentioned), less and excepting therefrom a flow of 9,500 cubic feet of water per minute previously deeded to Appleton Edison Light Company, Limited, and other small quantities theretofore leased. The maximum period in said lease was one hundred years and requiring notices of option on the part of the lessee at ten-year intervals, one of which was given in 1921. The

question raised and discussed as to the meaning and effect of certain of the clauses therein contained we do not set out because not passed upon or decided here.

The upper portion of the real estate here involved, that is, the portion abutting on the United States government dam, is, under the terms of the lease, subject to be withdrawn from the same upon the *Canal Company* acquiring the right to use or lease more than one half of the flow of said river at such dam; such other one half being controlled by the Kimberly-Clark Company since 1845.

Beyond the property covered by the terms of the lease, but within the area proposed to be taken by the condemnation proceedings, is a strip belonging to the *Canal Company,* but which has been and is now occupied and used by the *Traction Company* as tenant at will, and beyond that again and at the extreme end of the strip is a piece of land theretofore leased by the *Canal Company* to another corporation, whose rights thereto, however, have been acquired by the *Traction Company* but which lease expires by its terms May 26, 1927.

After entering into possession the *Traction Company* invested between $900,000 and $1,000,000 in flumes, tail races, electrical equipment, boiler house, generators, switchboards, substations, handling equipment, railroad tracks, coal yards, etc., and used a combined steam and water power with the usual kind of machinery and equipment in a modern public utility, and is now serving the cities of Neenah and Menasha with street-railway service and twenty-one neighboring municipalities with electric light and power, and is planning large and extensive additions to its plant in order to extend and enlarge its service.

It appears from the testimony that by virtue of the transaction with the United States government in 1872 the *Canal Company* had an interest in eleven power sites along the Fox river, all subject to the paramount right and control of the United States government as above indicated. Two of such

sites were as yet undeveloped, and on the remainder the *Canal Company* has eleven customers including the *Traction Company;* the arrangement between such several customers and the *Canal Company* being all by private contract or lease, some of which have still long periods of time to run. It owns some water wheels at the lower site in Appleton in the plant of the Interlake Pulp & Paper Company, one of its lessees. Since about 1907, on one of the sites in the city of Kaukauna, it has owned buildings, generators, and wheels, all of which were on February 1, 1923, leased by the *Canal Company* to the city of Kaukauna, a municipal corporation and public utility, for public-utility purposes, specifying certain real estate on the side of the river at Kaukauna together with the hydraulic canal leading from the pond created by the United States government dam across the Fox river at said city, together with the buildings on said real estate, "including the hydro-electric power plant on said lots known as the 'Badger Plant,' " together with machinery and personal property including the water wheels, gates, flumes, bulkheads, etc., used or useful in the operation of said plant and belonging to the lessor, together with the "right to take and use through the said canal and Badger Plant for hydraulic, hydro-electric, or other powers, so much of the flow of the Fox river at all stages as it comes to the dam as may be in excess of that taken under the dominant rights of the United States," etc.

The agreed rent was based upon designated amounts per kilowatt hour for all energy generated and used by the lessee from the two generators or any additional water turbines and electrical generators as may be installed. It also provided that upon the city obtaining an increase in rates for electric service it will increase the rent in said lease specified by fifty per cent. of the net profit derived from such increase, and the city bound itself to furnish the lessor with annual reports of increases in rates. It also provided that in the event of the development, during the term of said lease, of

any of the presently undeveloped water powers of the *Canal Company* "for the purpose of generating hydro-electric power, and selling the same as a public utility," then the city was, upon two years' notice, to surrender the lease, etc., with certain rights reserved to the city.

A further provision gave to the *Canal Company* a voice as to the person or persons employed in the active management and operation of the premises and required the dismissal by the lessees of persons found to be so unsatisfactory to the lessor.

In June, 1924, and prior to the commencement of these proceedings the executive committee of the board of directors of the *Canal Company* adopted a resolution reciting, among other things, that the advantages of manufacture and sale of electrical power are now obvious and established; that the best interests of the company will be advanced by the adoption of a policy which will ultimately place the company in the electrical-power field, and declaring that the policy of the *Canal Company* for the ensuing decade shall be (1) the manufacture and sale of electrical power; (2) to build electrical power plants and sell their undeveloped water-power sites; (3) to positively but gradually, and with due consideration of the value of the present and profitable relations with its several tenants, regain the control and use of the power sites now under direct lease; to use such sites so regained in co-operation with other properties of the company in the development of one general inter-connected and inter-supported electrical power system. At a special meeting of the directors of the *Canal Company,* August 5, 1924, prior to the service upon the *Canal Company* of the notice of the hearing in these proceedings, it was declared to be the policy of the company:

(1) To develop present undeveloped powers of the company.

(2) To develop all powers electrically.

(3) To acquire possession of the properties now under lease, as the same may be done from time to time.

(4) To lease all hydraulic powers, preferably to public utilities.

(5) To provide that all leases expire at about the same time.

(6) Thus permitting the *Canal Company* to take over and directly or indirectly operate the entire property as a single hydro-electric unit, preferably as a public utility.

And also that it proceed to develop, if it can be accomplished along certain lines, one of the power sites (Rapide Croche) into a hydro-electric power station, and that the executive committee immediately enter into negotiations with the city of Kaukauna or some other prospective tenant with a view of leasing such power station when completed and prepare immediately in detail the cost of such proposed development.

Estimates of the probable cost of machinery and equipment were made and formal bids were received for two water wheels.

The testimony further indicates that some time in the summer of 1924 an offer was made to the railroad commission on behalf of the *Canal Company* to subject itself to the jurisdiction of that commission as a public utility. At no time prior to the hearing, however, had reports been filed by the *Canal Company* as a public utility.

It further appeared that in January, 1908, the railroad commission suggested to the *Canal Company* that it file its rates and charges with the commission pursuant to the then newly enacted public utility law. Further correspondence was had on the subject, and the late Ephraim Mariner, then president of the company, on February 22, 1908, went into considerable detail by letter detailing the situation of the company as to its leases and suggesting that it is not a public utility.

The petition for condemnation was in the usual form and prayed for a hearing and a determination of the necessity for such taking. The defendant by answer, among other separate defenses, asserted that there was a want of juris-

62    SUPREME COURT OF WISCONSIN.    [Oct.

Wisconsin T., L., H. & P. Co. v. G. B. & M. C. Co. 188 Wis. 54.

diction by reason of the failure of the petitioner to first obtain from the railroad commission a certificate that public convenience and necessity required the acquisition of defendant's property, referring to secs. 32.04 and 31.15, Stats., and that it has used and operated said property and is using and operating it as a public utility, and that if defendant and the premises are subject to the jurisdiction of the state of Wisconsin, then as to the property so leased, occupied, and used by the petitioner the defendant is a public utility by reason of ch. 196 of the Statutes of Wisconsin, and for that reason the court has no jurisdiction and the petitioner has no right, power, or authority to condemn the property.

The hearing resulted in a determination by the judge granting the relief prayed for by petitioner, and from the order so determining, as well as from a subsequent order denying defendant's motion to set aside said former order, the *Canal Company* has appealed.

For the appellants there was a brief by *Lines, Spooner & Quarles* of Milwaukee and *Julius P. Frank* of Appleton, and oral argument by *Louis Quarles* and *Malcolm K. Whyte* of Milwaukee.

For the respondent there was a brief by *Olwell & Brady* of Milwaukee, and oral argument by *Bernard V. Brady* and *Lawrence A. Olwell.*

A brief was also filed by the *Attorney General, C. A. Erikson,* deputy attorney general, and *Suel O. Arnold,* assistant attorney general, as *amici curiæ,* and oral argument by *Mr. Erikson* and *Mr. Arnold.*

ESCHWEILER, J.    The *Traction Company,* the petitioner below, concededly a public utility, sought to condemn certain property and rights of the appellant corporation, the *Canal Company,* under an exercise of the right of eminent domain through the proceedings outlined in ch. 32, Stats. The appellant challenges the right of the *Traction Company* so to do, on the ground that the *Canal Company* is also a

20]      AUGUST TERM, 1925.      63

Wisconsin T., L., H. & P. Co. v. G. B. & M. C. Co. 188 Wis. 54.

public utility and protected from condemnation proceedings
by sec. 32.03, found in the same chapter, and which provides
that the general power of condemnation in that chapter shall
not extend, unless specifically conferred by law, to the con-
demnation by one public utility of the property of another.

By ch. 499, Laws of 1907, enacting secs. 1797m—1 to
1797m—108 (now found as sec. 196.01 *et seq.*), public
utilities were defined, control and regulation thereof as-
sumed by the state, and the railroad commission vested with
certain jurisdiction or power over them. The broad field in-
tended to be covered and the wide sweep and scope of the
powers to be thereafter exercised by the state over those
who dedicate their property to public service has been often
passed upon by this court and nothing need be now added
to what has been said as to such field and power, for instance
in *Calumet Service Co. v. Chilton,* 148 Wis. 334, 337, 338,
135 N. W. 131, or perhaps to cite, as illustrating the extent
to which this new public policy has changed the old theories
as in even such a substantial and fundamental branch of the
law as that of real estate, that it is now the law that that
which in other ownership would be real estate is, when
owned and used by a public utility, personal property. *Ire-
land v. Tomahawk L., T. & I. Co.* 185 Wis. 148, 151, 200
N. W. 642; *Superior W., L. & P. Co. v. Superior,* 174 Wis.
257, 296, 181 N. W. 113, 183 N. W. 254.

A public utility, as defined in sec. 196.01, Stats., so far
as pertinent to the situation here, is any corporation that
may own, operate, manage, or control any plant or equip-
ment or any part of a plant or equipment within the state,
for the production, transmission, delivery, or furnishing of
heat, light, water, or power either directly or indirectly to
or for the public.

The question whether a corporation such as is the *Canal
Company* is or is not a public utility in this state is one to
be ultimately determined by the judiciary by applying the
statutory definition of a public utility to the facts con-

64    SUPREME COURT OF WISCONSIN.    [Oct.

Wisconsin T., L., H. & P. Co. v. G. B. & M. C. Co. 188 Wis. 54.

cerning and the physical situation of any such company. The solution of the question is not dependent upon the attitude which the corporation may itself assume by either submitting to or refusing to submit to the jurisdiction and control of the railroad commission; nor again, upon whether or not the railroad commission has as yet assumed control and jurisdiction or failed or refused so to do. See *Schumacher v. Railroad Comm.* 185 Wis. 303, 201 N. W. 241.

It is very clear that under the record as here presented the valuable asset of the *Canal Company* is the right it owns and holds to use the surplus water power of the Fox river, subject to the primary right of the United States government to regulate and control the amount thereof as needed for navigation purposes, rather than its real estate adjacent to the river. It was this very thing that in 1901 the *Traction Company* included in its lease from the *Canal Company*, it being there designated as the right to use for hydraulic power one half (less specific reservations) of the flow of the Fox river not required for navigation at the Grand Chute dam, the one here in question, and it is the same that is sought to be condemned by the *Traction Company* and which it described in its petition in substantially the same language.

It is this water-power right, the possibility of generating hydro-electric energy, that the *Canal Company* has declared its intention, as set forth in the statement of facts, from now on, or for the coming decade at least, shall be placed in the electric-power field.

There are no precise formalities which must be undergone before a corporation becomes a public utility and default in which is an insuperable barrier to its becoming such. As pointed out in *Kilbourn City v. Southern Wis. P. Co.* 149 Wis. 168, 180, 181, 135 N. W. 499, it is not necessary that service by such corporation shall actually begin before its duties and liabilities as such arise or are imposed, other-

wise, as in that case pointed out, it might contract prior to actual service to evade the law as to uniformity of rates.

Whether the *Canal Company*, by virtue of its contract with the United States in 1872 and the prior acts of our legislature, is in a better or different position, has a higher or different title to surplus flow of the Fox river, than are or have been water-power companies on other of the navigable rivers of our state, need not be now considered, for in any event, as is pointed out in *In re Crawford County L. & D. Dist.* 182 Wis. 404, 409, 196 N. W. 874, the state, under the ordinance of 1787 and our constitution, is a trustee of the navigable waters within our confines, not merely for the people of this state but of the United States, and that the federal authority is paramount, and citing *Economy L. & P. Co. v. U. S.* 256 U. S. 113, 41 Sup. Ct. 409,—the latter, an interesting case, holding that though actual navigation on the Desplaines river in Illinois had been abandoned for one hundred years, nevertheless an obstruction there, even though to utilize its water power, but without prior federal consent, must be removed.

From the earliest days of our statehood the state has assumed control, through the Milldam Act, of the utilization of the water powers in its rivers. Whether always recognizing the paramount authority of the United States it is immaterial to now inquire, for such was always there, and, as held in *Economy L. & P. Co. v. U. S., supra,* such paramount control existed before, as well as after, Congress passed definite laws on the subject.

The state has justified the giving of the somewhat drastic power involved in the exercise of eminent domain to those seeking to build dams and to overflow their neighbor's land because of the public interest in the utilization of such latent power. *Allaby v. Mauston E. S. Co.* 135 Wis. 345, 351, 116 N. W. 4; *McDonald v. Apple River P. Co.* 164 Wis. 450, 456, 160 N. W. 156.

This power, when vested in a corporation, to control the water power, the so-called white coal of the state, is coupled with an authority and duty separate and quite distinct from ordinary corporate authority, as is pointed out in *Wis. River Imp. Co. v. Pier,* 137 Wis. 325, 337, 118 N. W. 857. When such a company enters the field of furnishing and selling the water power created by dams in our navigable waters it in effect dedicates such water power to a public use. *Pier Case, supra,* p. 336. When by ch. 380, Laws of 1915, the legislature placed the subject matter of the Milldam Act under the control of the railroad commission, it still more emphasized its intention of broadening the scope of public interest in its water power.

We think, therefore, that for these reasons the *Canal Company,* at the time when the condemnation proceedings here were started, was a public utility within the meaning of sec. 196.01, Stats.

There is still another and substantial reason why the *Canal Company* is within the field of public utilities. Its contract with the city of Kaukauna on February 1, 1923, and the terms of which have been set out in the foregoing statement of facts, was of such a nature that the *Canal Company* thereby placed itself in the position of one furnishing hydro-electric energy to the public. It leased an already erected and evidently then operating hydro-electric plant to the city of Kaukauna. That the city was described in the lease as a "public utility" as well as municipality, and the *Canal Company* was described merely as a corporation and not as a "public utility," could not change the legal effect. The *Canal Company* reserved plenary power over the employees who were to run the plant and had an absolute veto on their continued employment although not paying their wages. The rental was measured per electrical energy generated. Very significant features are the provisions that in case the city of Kaukauna obtained an increase in rates for electric service from its customers, the public,

it must increase the rent to the *Canal Company* by fifty per cent. of the net profit derived from such increase, and that the lease expressly provided for the contingency of the *Canal Company* becoming openly and beyond question a public utility. We consider this lease to be an unequivocal act by which the *Canal Company* undertook to furnish, directly or indirectly, hydro-electric power for lighting and heating purposes to the public, and by so doing the *Canal Company*, willy-nilly, was a public utility. It was as clearly a public utility as was the lessor in *Wisconsin E. P. Co. v. Lake*, 186 Wis. 199, 202 N. W. 195, where the builder and owner of the power plant leased all the power therein generated to a street-car company, which latter and not the owner actually operated the plant, that case, however, involving the income tax law rather than the statutes here considered.

Therefore, in view of the record as presented, we reach the conclusion that the *Canal Company*, at the time of the institution of the condemnation proceedings, being a public utility within the purview and meaning of the statute, the objection interposed to the condemnation by another public utility of its, the *Canal Company's*, property should have been sustained and the proceedings in the circuit court dismissed. This determination as to its immunity from these proceedings makes it unnecessary to pass upon the many other questions presented and argued, and we do not decide them.

*By the Court.*—Orders reversed, and the cause remanded with directions to dismiss the proceedings.